NOT DESIGNATED FOR PUBLICATION

No. 121,848

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DAKOTA CHARLES CONAWAY,
*Appellant*.


MEMORANDUM OPINION

Appeal from Barton District Court; CAREY L. HIPP, judge. Opinion filed October 8, 2021. Reversed and remanded with directions.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Douglas A. Matthews*, assistant county attorney, *M. Levi Morris*, county attorney, and *Derek Schmidt*, attorney general, for appellee.


Before ATCHESON, P.J., BRUNS and ISHERWOOD, JJ.


PER CURIAM: A drunk and obstreperous Dakota Charles Conaway heaved his bowling ball at a friend who was trying to calm him down. The bowling bowl found its target and opened a gash in the man's forehead. And a jury sitting in Barton County District Court found Conaway guilty of aggravated battery. On appeal, Conaway contends an irregular jury instruction on intent and the prosecutor's closing argument playing off that instruction individually or in combination deprived him of a fair trial. Given the stringent standard imposed on the State to overcome the cumulative impact of

1

those errors, we agree. We, therefore, reverse Conaway's conviction and remand to the district court with directions to grant a new trial.

## FACTUAL AND PROCEDURAL HISTORY

We may quickly sketch the pertinent facts. Conaway and his friend Jason Vonfeldt participated in a tournament at a bowling alley in Great Bend in January 2018. The tournament ended during the afternoon. Although Conaway and Vonfeldt competed on different teams, both lingered after the tournament. Conway continued to bowl, and the two were in the same vicinity. Conaway had been drinking heavily and became increasingly loud and profane as the day wore on. He directed much of his abusive language at a mutual acquaintance of his and Vonfeldt's.

Vonfeldt interceded twice to quiet Conaway since his conduct had gotten way out of hand and there were children within earshot. The first effort yielded only a temporary respite. During his second intercession, Vonfeldt suggested to Conaway that he should leave and he might be escorted out if he did not go voluntarily. Vonfeldt is considerably larger than Conaway and had at least the physical presence to make good on his suggestion. As Vonfeldt turned to walk away, Conaway unleashed a vulgarity at him.

Vonfeldt pivoted back around to face Conaway. Witnesses later testified they were no more than several feet part. Conaway was holding his 14-pound bowling ball in both hands at about mid-torso level. He immediately pitched the ball toward Vonfeldt in an underhand motion. The ball struck Vonfeldt in the forehead, bounced off, and rolled across the floor. A woozy Vonfeldt put his hands to his head and went to the restroom. He was bleeding heavily from a gash in his forehead. The wound required stitches, and at the trial in June 2019, Vonfeldt had a visible scar.

The State charged Conaway with aggravated battery, a severity level 7 felony violation of K.S.A. 2017 Supp. 21-5413(b)(1)(B), criminalizing "knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." The State alleged both ways of committing the crime and submitted Conaway used the bowling ball as a deadly weapon and the manner of the confrontation reasonably could have resulted in fatal or disfiguring injuries or great bodily harm.

During the two-day trial, several witnesses described the incident for the jurors. But Vonfeldt testified he could not recall being hit with the bowling ball. He remembered seeing it rolling on the floor, and he remembered being in the restroom and bleeding from the wound. Conaway testified in his own defense and told the jurors that Vonfeldt got within two feet of him during their second exchange. He characterized Vonfeldt as "very assertive" in telling him to shut up and leave—with Vonfeldt adding as an exclamation point that he would make Conaway shut up and leave. Conaway pointed out that Vonfeldt was somewhat larger and explained to the jurors he believed he was in physical danger. He told the jurors he "kind of flinched" and "pitched" the bowling ball. But on cross-examination Conway testified he neither intended to throw the bowling ball at Vonfeldt nor knew it would "fly out of my hands the way it did."

The district court instructed the jury on the elements of both aggravated battery consistent with the charge in the complaint and the lesser offense of misdemeanor battery. The district court also employed two jury instructions on intent that we discuss in more detail in explaining the trial errors. The jury was instructed on the law governing self-defense. As we have stated, the jurors convicted Conaway of aggravated battery.

The district court later sentenced Conaway to serve 12 months in prison with a 12-month period of postrelease supervision and placed him on probation for 24 months, reflecting a guidelines punishment consistent with Conaway's lack of any material

3

criminal history. Conaway was ordered to pay nearly $1,300 in restitution. The district court made a finding that the bowling ball constituted a deadly weapon—a determination that required Conaway to comply with the Kansas Offender Registration Act (KORA), K.S.A. 2020 Supp. 22-4901 et seq., for 15 years. Conaway has appealed.

LEGAL ANALYSIS

Conaway has asserted multiple points on appeal. We turn to his contentions about the jury instructions on intent and the prosecutor's remarks to the jurors in opening statement and closing argument.

*Jury Instructions*

The aggravated battery charge required the State to prove Conaway acted "knowingly" when he committed the crime. K.S.A. 2020 Supp. 21-5413(b)(1)(B). And "knowingly" is a statutorily defined "culpable mental state" under K.S.A. 2020 Supp. 21-5202 constituting an essential element of that form of aggravated battery. The district court had the obligation to inform the jurors of the legal principles governing the case and, in particular, what the State had to establish to convict Conaway. See K.S.A. 2020 Supp. 22-3414(3). The State, of course, had to prove the elements of the crime, including the requisite mental state, beyond a reasonable doubt. See *State v. Hatfield*, 60 Kan. App. 2d 11, 28, 484 P.3d 891 (2021); *State v. Franco*, 49 Kan. App. 2d 924, Syl. ¶ 8, 319 P.3d 551 (2014).

As described in K.S.A. 2020 Supp. 21-5413(b)(1)(B), acting "knowingly" has two components: A defendant's awareness of both "the nature of [his or her] conduct" and "that [his or her] conduct is reasonably certain to cause the [proscribed] result." K.S.A. 2020 Supp. 21-5202(i). The codified definitions of "intentionally," "knowingly," and "recklessly" were added to the Kansas Criminal Code in 2010 and became effective in

4

2011. See K.S.A. 2020 Supp. 21-5202(h), (i), (j). The Kansas Supreme Court has since considered the character of the mental state "knowingly" and what it requires to successfully prosecute defendants for aggravated battery in *State v. Hobbs*, 301 Kan. 203, 210-11, 340 P.3d 1179 (2015), and in *State v. Thomas*, 311 Kan. 905, 908, 468 P.3d 323 (2020). The court concluded the proof must establish the defendants were "reasonably certain" their conduct would cause the proscribed result. It is not enough to show a defendant acted with a generic intent to injure or merely acted deliberately or purposefully rather than accidentally or carelessly.

In *Hobbs* and *Thomas*, the court considered a form of aggravated battery requiring defendants to knowingly cause great bodily harm or disfigurement to their victims. See K.S.A. 2020 Supp. 21-5413(b)(1)(A). Although the defendants do not have to foresee the precise injury or the exact mechanism of the injury, they must be reasonably certain their conduct will inflict great bodily harm or disfigurement in some way. *Hobbs*, 301 Kan. at 213 (conviction "requires proof that an aggravated battery defendant acted while knowing that some type of great bodily harm or disfigurement of another person was reasonably certain to result from the defendant's action"); see also *Thomas*, 311 Kan. at 908 (endorsing and relying on *Hobbs*).

As provided in K.S.A. 2020 Supp. 21-5202(f), the culpable mental state applies to "all the material elements of the crime, unless a contrary purpose plainly appears." Here, the mens rea or criminal intent itself entails an understanding of the nature of any weapon used and of the potential severity of the injuries that might be inflicted. So the State had to prove Conaway acted knowingly in the sense he inflicted injury on Vonfeldt either with what he was reasonably certain to be a deadly weapon or in a manner he was reasonably certain could cause great bodily harm, disfigurement, or death. There is nothing in the aggravated battery statute to suggest the culpable mental state of "knowingly" would not extend to those components of the crime, even if they were somehow distinct from the mens rea or intent element. See *Hobbs*, 301 Kan. at 210-11

5

(recognizing expansive reach of K.S.A. 21-5202[f] in defining elements of crime). Here, the jurors needed to be informed of the elements of the aggravated battery charge in that way.

At the State's request, the district court included two instructions to the jurors dealing with the intent and culpable mental state required to convict Conaway. In Instruction No. 4, the district court informed the jurors in pertinent part: "A defendant acts knowingly when the defendant is aware of the nature of his conduct . . . or . . . the circumstances in which he is acting." The language is taken from PIK Crim. 4th 52.010 and incorporates one aspect of the statutory definition of "knowingly" in K.S.A. 2020 Supp. 21-5202(i), so it seems to be a correct, if limited, statement of the law. Standing alone the instruction is not patently objectionable, but it is an incomplete explanation of the governing law on intent in this case. See *State v. Dixon*, 289 Kan. 46, 68, 209 P.3d 675 (2009) ("A jury cannot be presumed to have legal knowledge outside the statements of law in the instructions.").

In Instruction No. 9, the second of the State's requested instructions on intent, the district court informed the jurors:

> "Committing a crime knowingly is purposefully performing a wrongful act. It is not
> necessary for the State to prove that the accused intended the precise harm or the result
> that occurred. Whether the defendant wanted to inflict the degree of harm suffered is
> beside the point. Knowingly committing a crime means a person is conscious of the act
> he is committing without necessarily understanding the consequences of that action."

Instruction No. 9 is, to say the least, irregular. It does not appear among the current pattern instructions. The language, in part, draws on both the definition of "willful conduct" in K.S.A. 21-3201(2), see *State v. Sterling*, 235 Kan. 526, 527, 680 P.2d 301 (1984), and the common-law description of general criminal intent, see *State v. Spicer*, 30 Kan. App. 2d 317, 324, 42 P.3d 742 (2002). But those concepts have been superseded

6

and likely outright negated by the culpable mental states codified in K.S.A. 2020 Supp. 21-5202, at least when it comes to aggravated battery. See *Hobbs*, 301 Kan. at 211. The language in Instruction No. 9 conflicts with the construction of "knowingly" in 21-5202(i) as applied in *Thomas* and *Hobbs* and relaxed the State's burden in proving Conaway acted with that culpable mental state. The instruction was, in a word, erroneous.

But Conaway's lawyer objected to neither Instruction No. 4 nor Instruction No. 9. The failure to object does not bar our review; we must, however, apply a clearly erroneous standard. K.S.A. 2020 Supp. 22-3414(3). To show reversible error, Conaway must firmly convince us the jury would have reached a different result had the instructional error not occurred. *State v. Timley*, 311 Kan. 944, 955, 469 P.3d 54 (2020). We are not prepared to say Conaway has satisfied that formidable standard when the evidence showed he heaved a hard, 14-pound object that struck Vonfeldt in the face at what would be point blank range. As we have indicated, we also consider the deficient instruction in assessing Conaway's claim for cumulative error, triggering a standard far more favorable to him.

*Prosecutor's Statements to Jury*

On appeal, Conaway assails comments the prosecutor made in his opening statement and in his closing argument to the jurors. We examine each under the analytical model for prosecutorial error the Kansas Supreme Court initially outlined in *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). The *Sherman* test first considers whether an error has occurred and then weighs any prejudice to the defendant resulting from the error. Comments made during opening statements or closing arguments will be considered error if they fall outside the wide latitude afforded a prosecutor in discussing the evidence or the law. 305 Kan. at 109. This simply transplants the initial step in the former process, though substituting the term "error" for "misconduct," a more pejorative

7

label at least connoting a deliberate violation of the rules even when there might be only an inadvertent mistake. 305 Kan. at 104-05.

If an appellate court finds the challenged statement to be prosecutorial error, it must then consider prejudice measured by the test set out in *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011), for a constitutional wrong. The State, as the party benefiting from the error, must demonstrate "'beyond a reasonable doubt'" that the mistake "'did not affect the outcome of the trial'" taking account of the full trial record. *Sherman*, 305 Kan. at 109 (quoting *Ward*, 292 Kan. 541, Syl. ¶ 6). That is, the appellate court must determine if the error deprived the defendant of a fair trial—a constitutional protection rooted both in due process and in the right to trial itself. 305 Kan. at 98-99, 109. The prejudice analysis in *Sherman* replaced a multifactor standard that also considered the prosecutor's bad intent or ill will—breaches of professional conduct the *Sherman* court concluded could be more appropriately addressed in ways other than reversing a conviction in the absence of material prejudice. 305 Kan. at 114-15.

Here, Conaway points to this portion of the prosecutor's opening statement as error under *Sherman*:

> "In the State of Kansas, we call striking someone with a deadly weapon aggravated battery. What we will establish is that in this context, when you're using a bowling ball to strike a person rather than a pin, you are using it as a deadly weapon. You are using it in such a manner that it can cause death, possibility of great bodily harm, injury. You will be asked to apply that law to the facts that you're going to be hearing about over the next two days. You will hear from Mr. Vonfeldt. You will hear from others who were at the bowling alley with him, and the defendant. You'll hear from a fireman, medical technicians, and the police who investigated the matter. What will we prove? That using a deadly weapon, a bowling ball, the defendant caused injury to Jason Vonfeldt. He struck at him in a manner where he could have caused serious bodily injury, death, and there's one other word I want you to remember, disfigurement."

8

The remarks extend beyond the proverbial "roadmap" indicating to the jurors what factually a party's evidence is likely to show and incorporates that anticipated showing into an analysis of the elements of aggravated battery—a quiet, though discernible, argument for conviction. The district court, however, had not introduced those legal concepts to the jurors at the start of the trial.

We recently described the purpose of opening statements this way:

"An opening statement to the jury affords lawyers the chance to outline what they anticipate the evidence will show and how that evidence fits with their theory of the case. See *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017). While lawyers enjoy some latitude in crafting opening remarks, they typically should avoid elaborate and repeated rhetorical flourishes promoting their desired outcomes—advocacy more properly undertaken in closing arguments after the jurors have heard the evidence and have been instructed on the law." *State v. Reed*, No. 120,613, 2021 WL 1228097, at *9 (Kan. App.) (unpublished opinion), *rev. denied* 313 Kan. 1046 (2021).

See also *State v. Garcia*, 40 Kan. App. 2d 870, 874, 196 P.3d 943 (2008). In a pristine sense, the prosecutor's opening may have strayed close to the line between a recitation of anticipated facts and a modulated pitch for conviction better left for a closing argument and ultimately may have fallen on the far side of the line. But drawn that way, the line exists mostly in trial practice classes and treatises. See, e.g., 35B C.J.S., Federal Civil Procedure § 969; 75 Am. Jur. 2d, Trial § 423 ("[A]n opening statement presents counsel with the opportunity to summarily outline to the trier of fact what counsel expects the evidence presented at trial will show, but it is not an occasion for argument."). A lawyer undoubtedly may conclude an opening statement by telling the jurors that at the end of the case—after they have heard the evidence and the district court has informed them of the applicable law—he or she will ask them to return a verdict for his or her client.

9

In practice, lawyers often mix some measure of argument or application of the law to the facts into their opening statements. And each side then tolerates the other's bending of the textbook strictures on those statements, at least to a degree. The district court should, of course, police opening statements and sustain proper objections to impermissibly argumentative or bombastic remarks. See *Garcia*, 40 Kan. App. 2d at 874 (district court exercised its sound discretion in sustaining objection to defense opening statement as lawyer began to explain State's burden of proof and how the evidence would fall short).

Tempering the pristine with the real, we find the prosecutor's opening remarks would not have been error in a closing argument, nor were they so explosive or provocative as to be grossly out of place. We do not treat the challenged remarks as prosecutorial error. Even if they were error in an opening statement, we entertain no reasonable doubt the verdict might have been different had they been omitted or deferred to the prosecutor's closing argument.

The prosecutor's closing argument, however, is another matter. This was not a whodunit case; Conaway indisputably did it. The prosecutor recognized Conaway's intent or state of mind to be the key issue in securing a conviction for aggravated battery. And, as we have discussed, that turned on proving Conaway had the required culpable mental state. To make that point to the jurors, the prosecutor zeroed in on Instruction No. 9 in his closing argument, saying:

> "If you would look at the instructions for aggravated battery and the instructions that go along with that, what you will learn is we don't have to show that the defendant intended the precise harm that he caused. We have to show that he wanted to throw the ball, and we have done that. We have to show that he wanted to throw the ball at Mr. Vonfeldt, and we have done that. But we don't have to show you that in his mind the defendant's going I'm going to throw this ball because it's my intention to cause a cut on

10

Jason Vonfeldt's forehead. If you read the instructions, we don't have to prove that. It is enough that we show that some harm was done. But let's carry that out a little bit further."

That portion of the closing argument suffers from the same legal flaws as Instruction No. 9. The prosecutor told the jurors they could and should convict because the State had to prove only that Conaway intended to throw the bowling ball and Vonfeldt suffered some harm as a result. But that is too lax a description of the requisite culpable mental state to convict a person of aggravated battery as established in *Hobbs* and reiterated in *Thomas*.

A prosecutor may not misstate the governing law to the State's advantage in arguing the case for a guilty verdict to the jurors. *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015). Here, the closing argument overstepped the broad latitude afforded prosecutors in pressing for a conviction. The misstatement amounts to prosecutorial error under *Sherman*. See *State v. Watson*, 313 Kan. 170, 179, 484 P.3d 877 (2021). We defer our discussion of prejudice to our analysis of Conaway's point on cumulative error. See *State v. Genzel*, No. 120,602, 2020 WL 3481499, at *7 (Kan. App. 2020) (unpublished) (deferring consideration of prejudice resulting from prosecutorial error in closing argument to cumulative error analysis), *rev. denied* 312 Kan. 896 (2020).

*District Court's Juror Orientation*

Before considering cumulative error, we dispose of a challenge Conaway has raised based on comments the district court made to the pool of potential jurors assembled at the start of the trial. The district court endeavored to explain generally the jury selection process and how the trial would proceed. In doing so, the district court told the potential jurors: "Under certain circumstances, parties are entitled to a jury when they are not otherwise able to settle their differences." The remark was imbedded in a much longer explanation of trial process and received no particular attention or emphasis.

11

Conaway suggests the observation amounted to judicial comment error and compromised his constitutional right to jury trial and the concomitant presumption of innocence that attaches to criminal defendants. See *State v. Boothby*, 310 Kan 619, 626-27, 448 P.3d 416 (2019) (recognizing and applying doctrine of judicial comment error as distinct from judicial misconduct). In *State v. Kleypas*, 272 Kan. 894, 996-97, 40 P.3d 139 (2001), the court found that the district court did not err in making a virtually identical comment to the potential jurors summoned for trial. Nothing in *Boothby* or the contours of the judicial comment error rule suggests a different result here. So, in keeping with *Kleypas*, we conclude the remark was not error.

The State also says the remark was a general one, not necessarily applicable to Conaway's case. We pause to question the need for such a comment, especially in a criminal case, even if it doesn't amount to error. A district court starts down a potentially dangerous path with remarks to potential jurors that may have nothing to do with the case at hand. A district court's observation about the parties' inability to "settle their differences" might conjure up thoughts of failed efforts at plea bargains or intransigent defendants for some potential jurors. And the comment doesn't seem to serve a useful purpose in acquainting potential jurors with the trial process. Ultimately, jurors should not be concerned with why the trial is being held. So while the comment may not be error, editorial discretion and excision might be the better practice at least in a criminal case.

*Cumulative Error*

Conaway argues he was deprived of a fair trial because of the cumulative effect of the trial errors he has identified. Appellate courts will weigh the collective impact of trial errors and may grant relief if the aggregated impact of the deficiencies has deprived the defendant of a fair hearing even when the errors considered individually would not necessarily require reversal of a conviction. *State v. Harris*, 310 Kan. 1026, 1041, 453

12

P.3d 1172 (2019); *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014). An appellate court examines the entire trial record to assess the effect of multiple trial errors. 301 Kan. at 167-68. The assessment takes account of "how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence." *State v. Miller*, 308 Kan. 1119, 1176, 427 P.3d 907 (2018).

Here, we consider the error in jury Instruction No. 9 on intent or state of mind and the prosecutor's erroneous closing argument on the same element of the aggravated battery charge. When the heightened review for constitutional error applies to one of the deficiencies—as it does for the prosecutor's misstatement of the law in closing argument—that standard governs the cumulative error analysis. *Thomas*, 311 Kan. 914. As we have outlined, the State must clear a formidable hurdle to establish harmless error. We have to be convinced beyond a reasonable doubt the jurors would have come to the same result without those errors.

The errors here are especially pernicious because they entail a cumulative misstatement of the law on a pivotal issue in the case against Conaway. The mistakes have a synergistic effect in which each enhances the prejudicial effect of the other. Ordinarily, a prosecutor's inaccurate argument about the elements of the crime could be lessened by a correct jury instruction. (We do not mean to imply a sound jury instruction would automatically inoculate against a bad closing argument infecting a trial with reversible error.) Likewise, a misleading instruction disadvantaging a criminal defendant, particularly on a peripheral matter, could be smoothed out through the prosecutor's legally correct argument to the jurors. But we don't have those checks or something like them in place here.

Both the jury instruction and the prosecutor's closing argument substantively understated what the State had to prove to establish Conaway acted "knowingly"—the

13

statutorily required mental state necessary to convict. In short, nothing guided the jurors to the legal principles they should have applied to the facts in assessing Conaway's culpability. As we have said, the interlocking errors had a pyramiding and decidedly negative impact on the jurors' ability to understand and correctly apply the law. And as we have also indicated, the problems contaminated the critical issue in this case.

Moreover, proof of the requisite culpable state of mind often may present a dicey question because wrongdoers seldom announce their evil mindedness. See *State v. Thach*, 305 Kan. 72, 83-84, 378 P.3d 522 (2016); *State v. Dixon*, 279 Kan. 563, 604, 112 P.3d 883 (2005). The State typically must rely on circumstantial evidence, and the jurors must be adequately informed of what they are looking for in weighing those circumstances. The jurors here were left to wander with a map that didn't accurately portray the landscape and a compass that didn't point north.[*]

[*]Our analysis (and perhaps our conclusion) would have been different had Conaway indisputably shouted, "Vonfeldt, I'm going to kill you!" as he threw the bowling bowl. At trial, Conaway could have denied he meant what he said, but that would be a fragile defense. Likewise, we would have a far different situation to consider had Conaway pulled out a handgun and shot Vonfeldt.

In *Thomas*, the court found analogous lapses in both the jury instructions and the State's closing argument added up to cumulative error sufficient to raise a reasonable doubt about the propriety of the guilty verdict on an aggravated battery charge. 311 Kan. at 914-15. Although the errors in *Thomas* are not identical to the ones we confront here, they are similar enough that the court's finding of prejudicial cumulative error supports our like conclusion.

In the end, the State leaves us unpersuaded that these errors together did not deprive Conaway of a fair trial. We do hold a reasonable doubt that the outcome might have been different had the instructions properly addressed the required culpable state of mind and had the prosecutor not exploited the erroneous instruction with an argument

14

misstating the law on that critical issue. We, therefore, reverse Conaway's conviction for aggravated battery and remand to the district court with directions to grant Conaway a new trial.

Because we have reversed Conaway's conviction, we do not take up the various challenges he has raised to the district court's determination under KORA that he used a deadly weapon to commit the crime. KORA registration depends upon a valid conviction. Those issues are now moot, and our consideration of them would entail advisory advice appellate courts typically should refrain from offering. Conaway, of course, may revive those arguments following remand should the need arise.

Reversed and remanded with directions.